**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Elite Performance LLC, an Arizona limited liability company, | ) ) | CV 20-00552-TUC-RM (LAB) |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **REPORT AND** |
| Echelon Property & Casualty Insurance Company, an Illinois corporation, | ) ) ) | **RECOMMENDATION** |
| Defendant. | ) ) ) | |
| _____ | ) | |

Pending before the court is the plaintiff's motion for partial summary judgment filed on March 14, 2022.  (Doc. 52)  The defendant filed a response on April 13, 2022.  (Doc. 58)  The plaintiff filed a reply on April 28, 2022.  (Doc. 64)

Also pending is the defendant's motion for partial summary judgment filed on March 14, 2022.  (Doc. 54)  The plaintiff filed a response on April 13, 2022.  (Doc. 61)  The defendant filed a reply on April 27, 2022.  (Doc. 63)

Also pending is the defendant's motion to strike the plaintiff's controverting statement of facts in support of its reply, filed on April 29, 2022.  (Doc. 66)  The plaintiff filed a response and the defendant filed a reply.  (Doc. 67);  (Doc. 69)

The case has been referred to Magistrate Judge Bowman for report and recommendation pursuant to the Local Rules of Practice.  LRCiv 72.1.

Background

1    In April of 2019, a small fire damaged property owned by the plaintiff, Elite
2  Performance. (Doc. 1-3, p. 3)  Elite contracted with AC/DC Corporation to fix the damage.  *Id.*
3  AC/DC's work, however, was subpar, and Elite subsequently filed suit against it (and its owner)
4  in Maricopa County Superior Court alleging negligence.  *Id.*, pp. 3-4  AC/DC was insured at
5  the time by the defendant in this action, Echelon.  *Id.*  AC/DC tendered the state court suit to
6  Echelon for a defense, but, after some back and forth, Echelon ultimately refused coverage.  *Id.*,
7  p. 4  Elite and AC/DC subsequently stipulated to a judgment in favor of Elite in the amount of
8  $475,000.  *Id.*, pp. 5-6  In addition, AC/DC assigned to Elite the bad faith and contract claims
9  it had against Echelon pursuant to *Damron v. Sledge*, 105 Ariz. 11, 460 P.2d 997 (1969).  *Id.*

10    Elite subsequently filed a bad faith and breach of contract action again Echelon in Pima
11  County Superior Court.  (Doc. 1-3, pp. 2-10)  On December 23, 2020, Echelon removed that
12  action to this court alleging diversity jurisdiction. (Doc. 1)  On December 30, 2020, Echelon
13  filed its Answer to Elite's Complaint.  (Doc. 6)  On January 20, 2021, Echelon filed an
14  Amended Answer raising a counterclaim for declaratory relief and a counterclaim
15  reimbursement of attorney fees. (Doc. 19)  Elite filed an Answer to the counterclaims on
16  January 29, 2021.  (Doc. 20)

17    On March 14, 2022, Elite filed its pending motion for partial summary judgment.  (Doc.
18  52)  Elite argues that the damages caused by AC/DC were covered by its insurance policy and
19  Echelon is obligated to pay the $475,000 judgment because it was "reasonable."  (Doc. 52-1)
20  Moreover, Elite argues that it is entitled to summary judgment on Echelon's counterclaim for
21  attorney fees and Echelon's counterclaim for a declaratory judgment should be dismissed with
22  prejudice.  *Id.*

23    Also on March 14, 2022, Echelon filed its pending motion for partial summary judgment.
24  (Doc. 54)  Echelon argues it is entitled to summary judgment on Elite's contract claim because
25  the alleged damages are not covered by the insurance policy.  *Id.*

26
27
28

1    On April 29, 2022, Echelon filed the pending motion to strike the plaintiff's
2    controverting statement of facts filed in support of its reply. (Doc. 66)  Echelon argues that the
3    filing violates the Local Rules.  *Id.*

4    A hearing on the motions for partial summary judgment was held on July 14, 2022.
5    (Doc. 71)  The court agrees with Echelon on the issue of coverage.  The property damage
6    allegedly suffered by Elite is not covered by the insurance policy because it was caused by the
7    AC/DC's negligence.

8

9    Summary Judgment

10   Summary judgment is available only "if the movant shows that there is no genuine
11   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.
12   R. Civ. P. 56(a). There is a genuine dispute "if the evidence is such that a reasonable jury could
13   return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,
14   248, 106 S.Ct. 2505, 2510 (1986).

15   The initial burden rests on the moving party to point out the absence of any genuine issue
16   of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).
17   "Where the moving party will have the burden of proof on an issue at trial, the movant must
18   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving
19   party."  *Soremekun v. Thrifty Payless, Inc.*,  509 F.3d 978, 984 (9th Cir. 2007). "Where the
20   non-moving party bears the burden of proof at trial, the moving party need only prove that there
21   is an absence of evidence to support the non-moving party's case."  *In re Oracle Corp.*
22   *Securities Litigation*,  627 F.3d 376, 387 (9th Cir. 2010).

23   Once initially satisfied, the burden shifts to the non-movant to demonstrate through the
24   production of probative evidence that an issue of fact remains to be tried.  *Celotex Corp.,* 477
25   U.S. at 324, 106 S.Ct. at 2553.  "If a reasonable jury viewing the summary judgment record
26   could find by a preponderance of the evidence that [the non-movant is] entitled to a verdict in
27   [its] favor, then summary judgment [is] inappropriate; conversely, if a reasonable jury could not

28

1  find liability, then summary judgment [is] correct." *Cornwell v. Electra Cent. Credit Union*,

2  439 F.3d 1018, 1027-28 (9th Cir. 2006).

3        "In judging evidence at the summary judgment stage, the court does not make credibility

4  determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d

5  978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the non[-

6  ]moving party." *Id.*

7        "Summary judgment is particularly appropriate to resolve questions of insurance

8  coverage, since the interpretation of a written contract is a matter of law to be determined by

9  the court." *757BD LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 330 F. Supp. 3d 1143,

10  1148 (D. Ariz. 2018), aff'd, 804 F. App'x 592 (9th Cir. 2020).

11

12        <u>Insurance Policy Interpretation</u>

13        "[T]he tenets of insurance policy contractual interpretation are well-established." *Nat'l*

14  *Fire Ins. Co. of Hartford v. James River Ins.*, 162 F. Supp. 3d 898, 903–04 (D. Ariz. 2016),

15  clarified on denial of reconsideration, 2016 WL 2606984 (D. Ariz. 2016). "An insurance policy

16  must be read as a whole, so as to give a reasonable and harmonious effect to all of its

17  provisions." *Id.* "The Court must construe the written terms of the policy to effectuate the

18  parties' intent, and to protect the reasonable expectations of the insured . . . ." *Id.* "[T]he

19  [p]olicy's language must be viewed from the standpoint of the average layman who is untrained

20  in the law or the field of insurance." *Id.* "Where the language of the policy is clear, the Court

21  shall afford it its plain and ordinary meaning and apply it as written." *Id.* "[C]ourts construe

22  a clause subject to different interpretations by examining the language of the clause, public

23  policy considerations, and the purpose of the transaction as a whole." *Id.*

24

25        <u>Contract Claim</u>

26

27

28

                                           - 4 -

1    Elite asserts that Echelon is bound by the judgment it obtained from AC/DC pursuant to

2  the *Damron* agreement. (Doc. 52)  Echelon argues that it is not. (Doc. 54)  The court begins

3  by reviewing the law in this area.

4    "A *Damron* agreement is a settlement agreement between an insured and an injured party

5  in circumstances where the insurer has declined to defend a suit against the insured." *757BD*

6  *LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 330 F. Supp. 3d 1143, 1149 (D. Ariz. 2018)

7  (punctuation modified), *aff'd*, 804 F. App'x 592 (9th Cir. 2020).  "Under the terms of the

8  agreement, the insured agrees to liability for the underlying incident and assigns all rights

9  against the insurance company to the injured party." *Id.*  "The insurer, in turn, generally may

10  contest any duty to indemnify by asserting that its policy did not cover the accident or claim."

11  *Id.*  "A *Damron* agreement does not create coverage that the insured did not purchase." *Id.*  "To

12  the contrary, the insurer is liable for the stipulated judgment only if the judgment constituted a

13  liability falling within its policy." *Id.*

14    Elite asserts that its damages are covered because there was "property damage." The

15  insurance policy ("the Policy") specifically states that the insured is covered for "property

16  damage." (Doc. 52, p. 3)  Property damage is defined as "[p]hysical injury to tangible property,

17  including all resulting loss of use of that property" or "[l]oss of use of tangible property that is

18  not physically injured," so called "impaired property." (Doc. 52, p. 4); (Doc. 54, p. 6)

19    Elite maintains that "there was physical injury to Elite's tangible property in multiple

20  ways: a) Elite's electric panel was damaged when AC/DC or its subcontractor drilled into it

21  creating a huge hole; b) Elite's electrical panel was damaged when AC/DC or its subcontractor

22  removed the covering on the busing; and c) Elite's pipe was broken when AC/DC or its

23  subcontractor broke it." (Doc. 52, p. 4)  Assuming these three circumstances constitute

24  "physical injury to tangible property" or "loss of use of tangible property" as defined in the

25  Policy, Echelon asserts that there is no coverage because these particular instances of property

26  damage are subject to Policy exclusions.

27

28                                  - 5 -

The Policy contains coverage exclusions for damage to property caused by the insured's negligence. The Policy exclusions read in pertinent part as follows:

2.     Exclusions

This insurance does not apply to:

\*    \*    \*

j.     Damage to Property

"Property damage" to:

\*    \*    \*

(5)   That part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of a property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\*    \*    \*

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

\*    \*    \*

m.     Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)     A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(Doc. 54, pp. 5-6); (Doc. 38-5, pp. 98-101) It appears that these exclusions apply to the areas of property damage identified by Elite.

- 6 -

The electrical panel was damaged when AC/DC, or its subcontractor, drilled a hole into it necessitating its replacement.  (Doc. 52, p. 4)  In the alternative, the panel was damaged when AC/DC, or its subcontractor, "removed the covering on the busing."  *Id.*  The panel is part of the building and therefore "part of real property" as stated in exclusion j(5).  (Doc. 54, pp. 5-6)  AC/DC was performing operations on the panel, and the property damage arose from those operations.  The hole in the panel, therefore, is property damage that is not covered pursuant to exclusion j(5).

In the alternative, the damaged panel is subject to exclusion j(6).  It is part of a property that must be replaced due to AC/DC's "work."  (Doc. 54, pp. 5-6)  It should be noted that exclusion j(6) does not apply to the "products-completed operations hazard," which generally includes "property damage" "occurring away from premises you own or rent and arising out of . . . "your work" except . . . "[w]ork that has not yet been completed or abandoned."  (Doc. 38-5, p. 111, ¶ 16 (a)(2))  Here, the work on the panel was not completed or it was abandoned; therefore, the "products-completed operations hazard" does not negate the exclusion.

Assuming the rest of the building was "impaired" due to the panel damage, this "damage" is subject to exclusion m(1) because the damage resulted from a "defect" or "deficiency" in "your work."  (Doc. 54, pp. 5-6)  In the alternative, exclusion m(2) applies because the "property damage" arose out of a "delay or failure . . . to perform a contract or agreement."  *Id.*  The qualification for "sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use" does not apply because the panel was never put to its intended use.  It was replaced eventually by a different firm.

The court's analysis of the "broken pipe" allegation is similar.  According to Elite, the pipe was "broken" when AC/DC negligently concluded that Elite's piping system needed to be dug up and modified.  *See* (Doc. 52, p. 4)  If the broken pipe constitutes property damage, there is no coverage due to exclusions j(5) and/or j(6).  If the broken pipe caused the building to be "impaired property," there is no coverage due to exclusion m(1) or m(2).

1    Summary judgment on the contract claim should be granted for Echelon and denied for

2    Elite.

3    Elite argues in the main that Echelon's argument on the issue of contract construction

4    is not permitted because this is a *Damron* action and "Echelon has not claimed that the

5    judgment was procured by fraud or collusion and cannot relitigate issues that could have been

6    litigated in the underlying litigation."  (Doc. 61, p. 4)  Elite maintains that "when an insurer

7    refuses to defend" its insured, "it does so at its peril. . . ."  (Doc. 61, p. 5)  (quoting *Quihuis v.*

8    *State Farm Mut. Auto Ins. Co*., 334 P.3d 719, 730) (Ariz. 2014)).  "[I]f a court later finds

9    coverage, the insurer must pay the damages awarded in the default judgment (at least up to the

10   policy limits) unless it can prove fraud or collusion . . . ."  *Id.*  "[T]he insurer has no right to

11   contest stipulated damages on the basis of reasonableness, but rather may contest the settlement

12   only for fraud or collusion." *Id.* (emphasis modified).

13   Elite correctly states the general rule.  If an insurer refuses to provide a defense for its

14   insured, it forfeits the chance to be heard on those issues that informed the judgment against its

15   insured.  Here, Echelon cannot dispute whether AD/DC acted negligently.  *See* (Doc. 61, p. 7)

16   (citing SOF ¶ 13)  Echelon cannot dispute whether the amount of damages resulting from that

17   negligence is reasonable or not.  And "*if a court later finds coverage*,"  Echelon "may contest

18   the settlement only for fraud or collusion."  *See Quihuis v. State Farm Mut. Auto Ins. Co*., 235

19   Ariz. 536, 547, 334 P.3d 719, 730 (2014)  (emphasis added).  Here, however, the court does *not*

20   find coverage.  Accordingly, Echelon is not liable to Elite for the *Damron* judgment.

21   Turning to the issue of Policy exclusions, Elite argues that none of them can apply

22   because they contradict the Policy's general statement that "It is the intent of this policy to

23   insure against 'property damage' which arises from services rendered, work performed and/or

24   products manufactured or distributed during the term of this policy."  (Doc. 61, p. 9)  Elite

25   asserts that an insurance policy "must be read as a whole, so as to give a reasonable and

26   harmonious effect to all of its provisions."  (Doc. 61, p. 9)

27

28

The court agrees with Elite's general statement as to the proper method for interpreting an insurance policy.  It does not agree that this general Policy statement requires that all coverage exclusions in the Policy be deemed void.  Coverage exclusions are simply that, areas that are excluded from the general rule of coverage.  "[T]he policy must be read as a whole, so as to give a reasonable and harmonious effect to *all* of its provisions" including those provisions that provide an exclusion from the general rule of coverage.  *See Charbonneau v. Blue Cross of Washington & Alaska*, 130 Ariz. 160, 163, 634 P.2d 972, 975 (Ct. App. 1981)  (emphasis added).

Elite asserts specifically that exclusion j(5) does not apply because in a Rule 30(b)(6) deposition, Echelon's witness stated that Echelon was "not claiming that any particular part of real property was damaged." (Doc. 61, p. 10)  Elite argues that "Echelon should not be allowed to take a different position now." *Id.*  But Elite does not explain why Echelon should not be allowed to change its position.  It does not, for example, say that it has taken some action in reliance on this statement that would inure to its detriment if Echelon were allowed to change its position.  Insurance companies sometimes change their position on an issue when new information is presented or old information is considered in a new way.  Change is not always inherently suspect.

Moreover, it does not appear that Echelon has, in fact, changed its position.  Echelon has always been dubious of Elite's assertions that someone drilled a hole in the electrical panel and/or broke the sewer pipe.  *See* (Doc. 58, pp. 7-8, 11)  Nevertheless, it does argue that these alleged instances of "property damage" are not covered because, assuming they occurred, they fall within one or more of the Policy exclusions.  Echelon's coverage argument is not precluded by this witness's prior statement.

Elite further argues that exclusion j(5) does not apply because "[t]he exclusion . . . only applies to 'real property'." (Doc. 61, p. 11)  For a definition of real property, Elite turns to

Black's Law Dictionary[1], which states that real property is "land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." (Doc. 61, p. 11)  Based on that definition, Elite asserts that the electrical panel is not "real property."  The court is not convinced.  Exclusion j(5) is not limited to "real property."  It applies to "*[t]hat part of real property* on which you or any contractors or subcontractors . . . are performing operations if the 'property damage' arises out of those operations." (Doc. 54, pp. 5-6);  (Doc. 38-5, pp. 98-101)  (emphasis added)  Presumably, the building is real property and the electrical panel is "part" of that real property.  The property damage alleged by Elite was caused by operations performed on that part of the real property.  The court concludes that the electrical panel is "part of real property" and exclusion j(5) applies.

Elite further maintains that exclusion j(6) is limited to "[t]hat particular part of a property that must be restored, repaired or replaced." (Doc. 61, pp. 12-13)  It therefore does not apply to "damages that resulted from the defective workmanship." *Id.* (citing *Desert Mountain Properties Ltd. P'ship v. Liberty Mut. Fire Ins. Co*., 225 Ariz. 194, 206, 236 P.3d 421, 433 (Ct. App. 2010), aff'd, 226 Ariz. 419, 250 P.3d 196 (2011)).  Elite's reasoning here is not entirely clear.  It seems to be arguing that exclusion j(5) only applies to the electrical panel and not to the building itself.  The building, however, was not otherwise damaged and would not qualify, by itself, as "property damage" under the Policy.  If Elite is correct and the Policy requires that the electrical panel be considered separately from the building itself, then exclusion j(6) applies only to the electrical panel, and it is not covered.  The building itself, however, did not suffer any property damage, so it would not be covered by the Policy either.

---

[1] The court will assume, without deciding, that the use of Black's Law Dictionary is not contrary to the general rule that "the Policy's language must be viewed from the standpoint of the average layman who is untrained in the law or the field of insurance." *Nat'l Fire Ins. Co. of Hartford v. James River Ins*., 162 F. Supp. 3d 898, 903–04 (D. Ariz. 2016), clarified on denial of reconsideration, 2016 WL 2606984 (D. Ariz. 2016).

1    One could argue that the building was "impaired property" or "property not physically

2  injured," but then it would be subject to the impaired property exclusions m(1) and m(2).  *See*

3  (Doc. 54, pp. 5-6);  (Doc. 38-5, pp. 98-101)  "The impaired property exclusion . . . is included

4  in standard CGL [commercial general liability] policies to prevent an insured from claiming

5  economic losses resulting from its own faulty workmanship, such as loss of use of its own

6  product."  *Morette Co. v. S.-Owners Ins. Co*., 301 F. Supp. 3d 1175, 1185 (N.D. Fla. 2017).

7  And that seems to be the crux of Elite's theory of damages; AC/DC negligently broke the

8  electrical panel and now economic losses to the building itself should be covered by the Policy.

9  This line of reasoning is precluded by exclusion m.

10    Finally, Elite argues that the "sudden and accidental physical injury" "exception to the

11  exception" applies to negate exclusions m(1) and m(2).  (Doc. 61, p. 15)  According to Elite,

12  Echelon has provided no evidence that "AC/DC or its subcontractors intentionally harmed

13  Elite."  *Id.*  Therefore, it reasons, the "exception to the exception" must apply.  *Id.*

14    The "exception to the exception" reads as follows:

15    This exclusion does not apply to the loss of use of other property arising out of
16    sudden and accidental physical injury to "your product" or "your work" after it
     has been put to its intended use.

17  (Doc. 54, pp. 5-6);  (Doc. 38-5, p. 101)  By its terms, the "exception to the exception" only

18  applies if the "loss of use" arises out of "sudden and accidental physical injury" to "your work"

19  "*after it has been put to its intended use*."  *Id.*  (emphasis added)  There is no allegation,

20  however, that the hole in the electrical panel was caused "after it has been put to its intended

21  use."  The hole apparently was caused while AC/DC was trying to fix Elite's electrical

22  problems.  The "exception to the exception" does not apply.  Exclusions m(1) and m(2) preclude

23  coverage for economic losses to the building itself.

24

25    Duty to Defend

26    Elite further argues that Echelon had a duty to defend AC/DC when Elite filed suit

27  accusing it of negligence.

28                                   - 11 -

1    "Under Arizona law, an insurer has a duty to defend the insured against any claim

2    potentially covered by the policy." *Nucor Corp. v. Emps. Ins. Co. of Wausau*, 975 F. Supp. 2d

3    1048, 1054 (D. Ariz. 2013) (punctuation modified). "The language of the insurance policy

4    controls the scope and extent of the insurer's duty to defend." *Id.* "The duty to defend arises

5    at the earliest stages of the litigation and generally exists regardless of whether the insured is

6    ultimately found liable." *Id.* "The duty to defend focuses on the facts alleged rather than the

7    legal characterization of the causes of actions alleged in the complaint against the insured."

8    In this case, Elite argues Echelon had a duty to defend based on allegations in the

9    underlying Complaint. According to Elite, that Complaint "alleged that AC/DC was negligent

10   and that Elite suffered damages." (Doc. 52, p. 6) Because the Policy provided coverage for

11   "property damage," Elite asserts that Echelon had a duty to defend. The court does not agree.

12   As the court explained above, the Policy contains exclusions for property damage caused

13   by the insured's negligence. Elite has not shown that allegations in the underlying Complaint

14   triggered the duty to defend.

15   Elite also asserts that the duty to defend was triggered by a tender letter AC/DC sent to

16   Echelon on May 13, 2020. According to the letter, AC/DC negligently subcontracted for a

17   plumber to move Elite's sewer line, unnecessarily dug a hole on the property, and improperly

18   installed underground electrical wiring. (Doc. 52, p. 7) The letter also stated that AC/DC's

19   negligent performance necessitated the temporary installation and operation of a generator to

20   supply electrical power to the building. *Id.* Again, the court finds that the Policy exclusions for

21   property damage caused by the insured's negligence indicate that the damages alleged by Elite

22   were not covered and Echelon did not have a duty to defend.

23   Elite's motion for summary judgment on its "duty to defend" claim should be denied.

24   (Doc. 52, pp. 5-8)

25

26   Counterclaim for Declaratory Relief

27

28                                              - 12 -

1    Elite maintains that Echelon's counterclaim for declaratory relief should be dismissed.
2    (Doc. 52, pp. 9-11)  Elite notes that a claim for declaratory relief is appropriate where litigation
3    has not commenced and there is a threat of future harm.  (Doc. 52, p. 10);  (citing *Santan*
4    *Crossing Pro. Plaza Condo. Ass'n v. Westfield Ins. Co.*, No. CV-20-00792-PHX-SPL, 2020 WL
5    4814345, at *3 (D. Ariz. Aug. 17, 2020)).  Here, however, litigation had already commenced
6    when the claim for declaratory relief was raised in the counterclaim.  Elite asserts that the
7    counterclaim should be dismissed "as a matter of law" because "the relief Defendant seeks
8    through its Counterclaim is substantively identical to what the Court will necessarily adjudicate
9    in ruling on Plaintiff's Complaint and Defendant's affirmative defenses."  (Doc. 52, pp. 9, 11)

10    In its response, Echelon states that it "does not necessarily agree that these claims and
11    issues are identical."  (Doc. 58, p. 15)  It does not, however, explain why it does not agree or
12    provide an example of a claim or issue that would remain unadjudicated when Elite's case is
13    resolved.

14    Elite's motion to dismiss the counterclaim for declaratory relief should be granted.  *See,*
15    *e.g., Santan Crossing Pro. Plaza Condo Ass'n*  at *5 ("Because Defendant's Counterclaim
16    raises no issues that will not be decided in the course of ruling on Plaintiff's Complaint and
17    Defendant's affirmative defenses, the Court grants Plaintiff's Motion to Dismiss pursuant to the
18    Court's discretion under the Declaratory Judgment Act.").

19

20    <u>Counterclaim for Reimbursement of Attorney Fees</u>

21    Echelon asserts that it (briefly) provided a defense to AC/DC for claims that later proved
22    to be not covered.  (Doc. 19, pp. 11-12)  In its counterclaim, Echelon argues that it is entitled
23    to reimbursement for those attorney fees, and because Elite is an assignee of its insured, Elite
24    is obligated to pay Echelon the costs of that defense.  *Id.*  In essence, Echelon is arguing that
25    there was no coverage; therefore, there was no duty to defend, and AC/DC was unjustly
26    enriched when Echelon provided a defense.  (Doc 19, pp. 11-12)

27

28                                                            - 13 -

1   In its motion, Elite argues it is entitled to summary judgment on this counterclaim citing
2   *Great Am. Assurance Co. v. PCR Venture of Phoenix LLC*, 161 F. Supp. 3d 778, 786 (D. Ariz.
3   2015). (Doc. 52, p. 12) That court held that a claim for reimbursement should be denied as a
4   matter of law because "there is no indication the Arizona Supreme Court would narrow the duty
5   to defend such that it only exists when the duty to indemnify is also triggered." (Doc. 52, p. 12)
6   In other words, the fact that there was no coverage does not automatically mean there was no
7   duty to defend. Echelon's counterclaim, on the other hand, seems to rely on the opposite view
8   – there was no coverage; therefore, there was no duty to defend. *See Great Am. Assurance Co.*,
9   161 F. Supp. 3d at 786 ("[A]llowing for the recovery of defense costs when coverage is later
10  found not to exist would effectively make the duty to defend and duty to indemnify
11  coterminous."). The court finds that Elite's argument is well taken. Moreover, Echelon failed
12  to address this issue in its response brief.

13  Elite's motion for summary judgment on the counterclaim for reimbursement of attorney
14  fees should be granted. (Doc. 52)

15

16  Echelon's Motion to Strike

17  On April 29, 2022, Echelon filed the pending motion to strike Elite's controverting
18  statement of facts filed in support of its reply brief. (Doc. 66) Echelon argues that the filing
19  violates LRCiv 56.1(b).

20  The Local Rules provide that a party moving for summary judgment must file a separate
21  statement of facts in support of the motion. LRCiv 56.1(a). A party opposing a motion for
22  summary judgment must file a separate statement of facts supporting that party's opposition.
23  LRCiv 56.1(b). The original movant may file a reply in support of its motion for summary
24  judgment, but "[n]o reply statement of facts may be filed." LRCiv 56.1(b).

25  "[A] motion to strike may be filed . . . if it seeks to strike any part of a filing or
26  submission on the ground that it is prohibited . . . by a statute, rule, or court order."
27  LRCiv7.2(m)(1).

28

In this case, Elite filed a motion for partial summary judgment and a separate statement of facts. (Doc. 52); (Doc. 53) Echelon filed a response brief and a separate statement of facts. (Doc. 54); (Doc. 55) Elite then filed a reply brief and a reply statement of facts entitled "Elite Performance, LLC'S Controverting Statement of Facts to Echelon's Separate Statement of Facts in Support of Opposition to Elite's Motion for Partial Summary Judgment." (Doc. 64); (Doc. 65)

The reply statement of facts was filed in violation of the Local Rules. It should be stricken. *See* LRCiv 56.1(b); LRCiv 7.2(m)(1).

Elite explains that none of the information in the reply statement of facts is necessary for its motion to be granted, but the document "make[s] it easier for the Court to see each claim and each response in a clear document." (Doc. 67) The court finds that the briefs and statements of fact filed in this case in accordance with the Local Rules provide sufficient material on their own for the court to properly address the outstanding motions.

Elite further argues that Echelon presented in its Controverting Statement of Facts an unexpected argument concerning Dan Fazio's testimony and Elite believed it was entitled to direct the court to contrary testimony. *See* (Doc. 65, pp. 27-28) The court finds that if Elite believed it was essential to provide the court with a reference to Dan Fazio's testimony it could have attached the pertinent deposition page as an exhibit to its reply. There was no need to file a 28-page reply statement of facts.

RECOMMENDATION

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an order

DENYING the plaintiff's motion for summary judgment on its contract claim (Doc. 52),

GRANTING the defendant's motion for summary judgment on the plaintiff's contract claim (Doc. 54),

DENYING the plaintiff's motion for summary judgment on its "duty to defend" claim (Doc. 52),

GRANTING the plaintiff's motion to dismiss the defendant's counterclaim for a declaratory judgment (Doc. 52),

GRANTING the plaintiff's motion for summary judgment on the defendant's counterclaim for reimbursement of attorney fees (Doc. 52), and

GRANTING the defendant's motion to strike the plaintiff's reply statement of facts. (Doc. 66)

Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within 14 days of being served with a copy of this report and recommendation.   If objections are not timely filed, the party's right to de novo review may be waived.  The Local Rules permit the filing of a response to an objection.  They do not permit the filing of a reply to a response without the permission of the District Court.

DATED this 16th day of August, 2022.

Leslie A. Bowman
United States Magistrate Judge